**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **KUSH WILKERSON;** | : | **Case No.** 2:25-cv-919 |
| **Plaintiff,** | : | |
| **v.** | : | **ELECTRONICALLY FILED** |
| **HUNTER SARVER, Sergeant; WILLIAM SUNDY, Sergeant; JASON HOLT, Sergeant; CODY COVINE, Correctional Officer; WILLIAM KEMP, Correctional Officer; ORLANDO HARPER, Warden of Allegheny County Jail; JASON BEASOM, Chief Deputy Warden; ALLEGHENY COUNTY; JOHN DOES 1-5** | : | **JURY TRIAL DEMANDED** |
| **Defendants.** | : | |

## INTRODUCTION

1.      Plaintiff Kush Wilkerson brings this lawsuit to seek justice against several correctional officers who brutally assaulted him at the Allegheny County Jail (ACJ), the supervisors who knowingly enabled this brutality, and to bring awareness to the manner in which incarcerated people are treated in this county. He is a 29-year-old pretrial detainee incarcerated at the Allegheny County Jail with well-documented psychiatric disabilities. The assault occurred in July 2023 and caused serious physical and mental injuries to Mr. Wilkerson, many of which persist to this day – including headaches, a worsened memory, a persistent eye glare, nearly daily rectal bleeding, increased anxiety and paranoia, routine nightmares, and vivid flashbacks.

2.      Sergeants Sarver, Sundy, and Holt, along with correctional officers Kemp, Covine, and John Does 1-5, used excessive force in an assault on Mr. Wilkerson that occurred July 12, 2023.

3.      Defendant Sarver tased Mr. Wilkerson four times, including once in the scrotum and once in the rectum. Mr. Wilkerson was fully handcuffed and on the ground when Defendant Sarver deployed the taser in his rectum.

4.      Supervisory Defendants Warden Orlando Harper and Deputy Warden Jason Beasom ("Supervisory Defendants") knew that Defendants had an extensive history of using excessive force on incarcerated individuals and did nothing to prevent the assault on Mr. Wilkerson.

5.      Supervisory Defendants knew that Defendants had an extensive history of assaulting incarcerated people with psychiatric disabilities and failed to enact remedial measures to prevent excessive force incidents like the one perpetrated against Mr. Wilkerson.

6.      Supervisory Defendants failed to adequately train, supervise and discipline ACJ corrections staff for such conduct, which has resulted in the rampant use of unlawful force on people incarcerated at ACJ.

**JURISDICTION AND VENUE**

7.      This case is brought pursuant to the Fourteenth Amendment of the United States Constitution, 42 U.S.C.§ 1983, 28 U.S.C. §§ 2201, 2202, the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a).

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4).

9.      This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the claims occurred in Allegheny County, in the Western District of Pennsylvania.

**PARTIES**

10.     Plaintiff Kush Wilkerson is and has been a pretrial detainee since July 5, 2023. He has been diagnosed with ADHD, PTSD, paranoid schizophrenia, major depressive disorder, bipolar disorder, and general anxiety disorder. Defendants Sarver, Sundy, Holt, Covine, and Kemp assaulted Mr. Wilkerson using excessive force, causing him extensive physical and mental injuries.

11.     Defendant Hunter Sarver was at all relevant times an employee of Allegheny County, serving as a sergeant at ACJ. Defendant Sarver was at all relevant times acting under the color of state law. Defendant Sarver is sued in his individual capacity.

12.     Defendant Jason Holt was at all relevant times an employee of Allegheny County, serving as a sergeant at ACJ. Defendant Holt was at all relevant times acting under the color of state law. Defendant Holt is sued in his individual capacity.

13.     Defendant William Sundy was at all relevant times an employee of Allegheny County, serving as a sergeant at ACJ. Defendant Sundy was at all relevant times acting under the color of state law. Defendant Sundy is sued in his individual capacity.

14.     Defendant William Kemp was at all relevant times an employee of Allegheny County, serving as a correctional officer at ACJ. Defendant Kemp was at all relevant times acting under the color of state law. Defendant Kemp is sued in his individual capacity.

15.     Defendant Cody Covine was at all relevant times an employee of Allegheny County, serving as a correctional officer at ACJ. Defendant Covine was at all relevant times acting under the color of state law. Defendant Covine is sued in his individual capacity.

16.     Defendants John Does 1-5 were at all relevant times employees of Allegheny County, serving as corrections officers at ACJ. Defendants John Does 1-5 were at all relevant times acting under the color of state law. Defendants John Does 1-5 are sued in their individual capacities.

17.     Defendant Jason Beasom was at all relevant times the Chief Deputy Warden at ACJ. He was responsible for oversight and administration of the investigation and discipline of corrections officers for uses of force on incarcerated people confined at ACJ. Defendant Beasom was at all relevant times acting under the color of state law. Defendant Beasom is sued in his individual capacity.

18.     Defendant Orlando Harper was at all relevant times the Warden at ACJ and as such was responsible for the oversight, operation and administration of ACJ, including security and use-of-force policies and practices, staff training, and ensuring accommodations for incarcerated people with physical or psychiatric disabilities. Defendant Harper was at all relevant times acting under the color of state law. Defendant Harper is sued in his individual capacity.

19.     Defendant Allegheny County is a county government organized and existing under the laws of the Commonwealth of Pennsylvania. Allegheny County is in possession and control of ACJ.

## STATEMENT OF FACTS

### Practice and Custom of Excessive Use of Force at Allegheny County Jail

20.     Allegheny County Jail is one out of approximately 65 jails in the state.

21.    In 2023, the Allegheny County Jail had the highest number—by a substantial margin—of physical assaults by corrections officers on incarcerated individuals of all the county jails in Pennsylvania, accounting for approximately 13% of the statewide total.

22.    In 2023, the Allegheny County Jail used stun devices on incarcerated individuals 183 times–over five times as often as the second highest county and accounting for approximately 43% of the statewide total.

23.    ACJ officers have routinely and wantonly exerted force on the population of individuals with psychiatric disabilities incarcerated at ACJ, more than 90% of whom are pretrial detainees who are not serving a sentence for a criminal conviction.

24.    ACJ's officers, excessively and without penological justification, use tasers and blunt physical force against people with disabilities at ACJ.

25.    Officers routinely use tasers and blunt physical force on people with psychiatric disabilities when they are exhibiting symptoms of their disabilities. This has occurred without oversight, and often in situations where the person being assaulted has already been subdued.

26.    ACJ officers commonly use tasers and blunt physical force without any oversight or care from mental health or medical care staff and without adequate health safeguards.

27.    The overuse of physical force and tasers is the result of Supervisory Defendants' policies and practices which allow officers to use excessive force for purely punitive and vindictive reasons without oversight or repercussions.

28.    The overuse of physical force and tasers in response to symptoms of psychiatric disabilities is the result of Supervisory Defendants' policies and practices which allow officers to do so without oversight or repercussions and a failure to train officers in recognizing psychiatric disabilities and engaging in de-escalatory tactics.

29.     On September 15, 2020, *Howard v. Williams*, No. 2:20-cv-01389 (W.D.Pa 2020), a class action brought on behalf of plaintiffs incarcerated at the ACJ, was filed. Plaintiffs in the *Howard* case all had psychiatric disabilities and brought claims that included (1) excessive use of force; (2) violation of the Americans with Disabilities Act; (3) violation of the Rehabilitation Act; and (4) failure to train.

30.     On July 30, 2024, a settlement order was entered into in the *Howard v. Williams* case requiring additional reviews of and discipline for use of force policy violations.

31.     On December 1, 2020, *Walker v. Raible*, No. 2:20-cv-01868 (W.D.Pa. 2020), was filed, accusing Sergeant John Raible and other ACJ staff of brutally assaulting multiple incarcerated women with psychiatric disabilities. Supervisory liability claims were brought against Defendants Harper and Beasom in that case as well. Claims that were brought included (1) excessive uses of force; (2) battery; (3) violation of the Americans with Disabilities Act; and (4) violation of the Rehabilitation Act.

32.     The *Walker v. Raible* case settled out of court in July 2023.

33.     Numerous grievances and several recent lawsuits have been filed alleging various forms of harassment and abuse by Defendant Sarver, including but not limited to the following:[1]

- Aaron Tipton filed a lawsuit in 2023 alleging that Defendant Sarver subjected him to daily strip searches and solitary confinement without justification in retaliation for filing grievances against him alleging prior abuse. He also alleged that Defendant Sarver planted contraband in his cell, which resulted in a criminal conviction.

---

[1] Arshi Qureshi & Bella Markovitz, *Here's what 7 lawsuits in 5 years against 1 Allegheny County Jail sergeant tell us about the correctional system*, PUBLIC SOURCE (May 27, 2025), https://www.publicsource.org/allegheny-county-jail-sergeant-lawsuits-allege-abuse/.

- William Jackson filed a lawsuit in 2023 alleging that Defendant Sarver threw his belongings including legal documents on the floor, made derogatory and sexually explicit comments towards him, and spread a rumor about him being a "snitch" which led to an assault.

- Antwan McCarrel filed a lawsuit in 2024 alleging that Defendant Sarver used excessive force against him in two separate occasions involving physical assault and use of a taser.

- Allen Charles filed a lawsuit in 2021 alleging that he reported drug trafficking to Defendant Sarver who did not address it or follow up.

- Lafon Ellis filed a lawsuit in 2022 alleging that Defendant Sarver falsely accused him of possessing contraband resulting in him spending time in the Restricted Housing Unit.

- Randall Hockett filed a lawsuit in 2020 accusing Defendant Sarver of misplacing or destroying important legal paperwork.

- James Byrd filed a lawsuit in 2020 alleging that Defendant Sarver was involved in facilitating a system that allowed excessive use of force and retaliation without consequence.

34. Many of these cases were dismissed for procedural reasons and thus no substantive ruling regarding the allegations was ever issued. Each case contributed to Supervisory Defendants' awareness that Defendant Sarver engaged in a pattern of excessive force and other abuses of authority.

**July 12 Assault**

35.     Mr. Wilkerson was arrested and brought to the Allegheny County Jail on July 5, 2023, and he remains incarcerated there today. He previously resided in the jail from August 2020 to February 2021, and December 2013 to March 2016.

36.     Mr. Wilkerson had known mental health diagnoses of ADHD, PTSD, paranoid schizophrenia, major depressive disorder, bipolar disorder, and general anxiety disorder.

37.     Mr. Wilkerson lost his sister, brother, cousin and uncle in a period of approximately 16 months between 2021 and 2022.

38.     Mr. Wilkerson reported to a Mental Health Specialist employed by ACJ that he was having auditory hallucinations of deceased loved ones on July 5, 2023.

39.     On July 12, 2023, Mr. Wilkerson encountered a former cellmate of his from 2021 on pod 4E. In or around 2021, Mr. Wilkerson filed a PREA complaint against this individual for committing obscene acts in front of him in their shared cell.

40.     Mr. Wilkerson, who believed a separation was in place to prevent them from crossing paths, became shocked and upset upon seeing his former cellmate.

41.     Mr. Wilkerson swatted his former cellmate on the back of the head while in the dayroom and walked away.

42.     Approximately 15-30 minutes later, Defendant Sarver approached Mr. Wilkerson and accused him of punching his former cellmate. He then took Mr. Wilkerson into the sallyport in pod 4E, where Defendant Covine was already present.

43.     Defendant Sarver told Mr. Wilkerson to face the wall and put his hands up. Defendant Sarver cuffed one of Mr. Wilkerson's hands as Mr. Wilkerson tried to explain that he believed a separation was supposed to have been in place between himself and his former

cellmate. Mr. Wilkerson partially turned his torso and head while trying to speak to Defendant Sarver. Defendant Sarver then tased Mr. Wilkerson in the side of his torso.

44.    Mr. Wilkerson then fell to the ground. Both Defendant Sarver and Defendant Covine punched Mr. Wilkerson in the head while he was on the ground.

45.    Mr. Wilkerson tried to stand back up and asked Defendant Sarver and Defendant Covine to stop punching him. Defendant Sarver then tased Mr. Wilkerson a second time in his front torso.

46.    At this point, suffering greatly from pain and fearing for his life, Mr. Wilkerson began to step away towards the kitchen area. He walked approximately 5-7 steps and tried to squeeze through the wicket opening to get back on the pod, but he was grabbed by either Defendant Sarver or Defendant Covine by his legs and pulled back towards them.

47.    Mr. Wilkerson then heard a "Code 3" being called, shortly after which several other additional correctional officers arrived.

48.    While he was facing the ground and partially through the wicket opening, approximately 8-10 correctional officers begin to assault him, mainly punching him and kicking him.

49.    While he was in this position, Defendant Sarver shoved his taser into Mr. Wilkerson's groin area and deployed it. The taser attached to Mr. Wilkerson's scrotum, causing severe pain.

50.    At some point while Mr. Wilkerson was still facing the ground and partially in the door opening, he was fully handcuffed.

51.     After he was fully handcuffed, Defendant Sarver shoved his taser in between Mr. Wilkerson's buttocks and deployed it. The taser attached to Mr. Wilkerson's anus, causing unbearable pain.

52.     After he was tased in the anus, Mr. Wilkerson heard one correctional officer ask, "is he breathing?"

53.     Several other incarcerated people on pod 4E began yelling and throwing coffee and water towards the correctional officers to try and stop the assault.

54.     Throughout this time, Mr. Wilkerson continued to be kicked and punched. Mr. Wilkerson was then kicked in the head and temporarily lost consciousness.

55.     Mr. Wilkerson began to regain consciousness while being hauled to the elevator. The officers carrying him rammed his head into the back of the elevator at least three times. Approximately 8-10 correctional officers were present in the elevator, including Defendants Sarver, Sundy, and Kemp.

56.     Defendants present on the elevator continued kicking and punching Mr. Wilkerson in the elevator and called him various slurs including the n-word, "cunt," and "motherfucker." One correctional officer stated, "We'll kill you."

57.     Mr. Wilkerson looked to Defendant Kemp and begged him to make the assault stop. Defendant Kemp then punched Mr. Wilkerson in the face, after which Mr. Wilkerson partially lost consciousness again.

58.     Defendants transported Mr. Wilkerson to 8E and continued to punch and kick him there as well. While on 8E, Defendant Kemp along with others were involved in the assault. While on 8E, a nurse asked Mr. Wilkerson if he was suicidal. He responded that he was, and he was taken to 5D, the mental health pod.

59.    On 5D, Defendant Kemp, Defendant Holt, and approximately three other correctional officers took Mr. Wilkerson to a cell and conducted a strip search. While doing so, they made threats to "shoot him up the ass" and give him a "water plunge" and made jokes about his "cavity." Defendant Holt kept his taser aimed at Mr. Wilkerson's face at multiple times during the strip search.

60.    On July 13, 2023, Mr. Wilkerson was moved to 5C.

61.    In the days after his assault, Mr. Wilkerson was coughing up copious amounts of blood and bleeding profusely from his rectum.

62.    In the days after the assault, Mr. Wilkerson reported pain and aches in the right side of his body, right shoulder pain, hip discomfort, face tenderness, and posterior scalp pain.

63.    Mr. Wilkerson additionally had a tooth implant knocked out, a deep eyebrow abrasion, and severe pain in his groin and rectum.

64.    Approximately two days after the assault, Mr. Wilkerson had vivid visual hallucinations for the first time, including that a tiger was in his cell.

65.    On July 16, 2023, Mr. Wilkerson had a mental health episode wherein he screamed out of his cell for an hour. He reported to a psychiatrist on July 17, 2023 that he was set off by a correctional officer stating to him, "Now I know why you got your ass beat."

66.    Mr. Wilkerson made multiple reports to medical and mental health staff about insomnia and nightmares since the July 12 assault, some of which included flashbacks to the assault by correctional officers.

67.    Mr. Wilkerson made multiple reports to medical and mental health staff about a suspected concussion, headaches, worsened memory, and persistent eye glare on his right eye since the July 12 assault.

68.     Mr. Wilkerson continues to have almost daily rectal bleeding and pain while defecating.

69.     Since the assault, Mr. Wilkerson sometimes coughs up blood after physical activity and becomes more easily winded.

70.     Mr. Wilkerson continues to have vivid nightmares about being assaulted by correctional staff.

71.     Since the assault, Mr. Wilkerson has experienced heightened anxiety and paranoia about being targeted by correctional officers.

72.     Since the assault, Mr. Wilkerson experiences anxiety, stress, and panic every time he is handcuffed or otherwise restrained, even if it is merely for routine matters such as transport.

73.     Mr. Wilkerson still experiences more headaches and forgetfulness than he did before the July 12 assault.

74.     Mr. Wilkerson filed a PREA complaint in relation to the intentional tasing of his groin and rectum by Sergeant Sarver. The complaint was dismissed. No examination of his genital areas or anal cavity was ever conducted in relation to the PREA investigation.

**Denial of Equal Access to Safe Security Practices and Fair Disciplinary Processes**

75.     Mr. Wilkerson is diagnosed with paranoid schizophrenia, bipolar disorder, PTSD, major depressive disorder, and general anxiety disorder.

76.     Symptoms of schizophrenia include hallucinations, delusions, cognitive impairment, disorganized thoughts, and erratic behavior.[2]

---

[2] *Schizophrenia*, Nat'l Inst. Health, https://www.nimh.nih.gov/health/statistics/schizophrenia (last accessed 5/21/2025); *Paranoid Schizophrenia: Symptoms, First Aid, and Crisis Intervention*, Am. CPR Care Ass'n, https://cprcare.com/blog/paranoid-schizophrenia-first-aid/ (last accessed 9/23/25).

77.     Guidelines about how to communicate with individuals with schizophrenia from mental health professionals include the following: listening, using a gentle voice, and explaining your actions.[3]

78.     As explained by Banyan Treatment Center: "[A] person with schizophrenia may struggle to understand things like movements. They may feel extremely afraid and paranoid at that moment, so it's important to explain your actions with words. If you're pulling out a chair to sit down, tell them that. If you're pulling out your phone to check something, tell them that. Remember that details matter."[4]

79.     Impulsive behavior is a core symptom of bipolar disorder.[5] Other symptoms of bipolar disorder include hallucinations, delusions, episodes of mania, mood swings, and suicidality.[6]

80.     Symptoms of PTSD include being easily startled, feeling on guard or on edge, feeling irritable, aggressive outbursts, and engaging in risky behavior.[7]

81.     Symptoms of depression include low mood, decreased energy, and suicidality.[8]

---

[3] *What Not to Say to Someone with Schizophrenia*, BANYAN TREATMENT CTR, https://mentalhealth.banyantreatmentcenter.com/blog/talking-to-someone-with-schizophrenia/ (last accessed 9/23/25).
[4] *Id.*
[5] Robyn L Powers et al., *Impulsivity in bipolar disorder: relationships with neurocognitive dysfunction and substance use history*, 15(8) Bipolar Disorders 876, 876 (2013).
[6] *Bipolar Disorder*, NAT'L ALL. ON MENTAL ILLNESS, https://www.nami.org/about-mental-illness/mental-health-conditions/bipolar-disorder/ (last accessed 5/21/2025).
[7] *Post-Traumatic Stress Disorder*, NAT'L INST. HEALTH, https://www.nimh.nih.gov/health/publications/post-traumatic-stress-disorder-ptsd (last accessed 5/21/2025).
[8] *Major Depression*, JOHN HOPKINS MED., https://www.hopkinsmedicine.org/health/conditions-and-diseases/major-depression (last accessed 5/21/2025),

82.     Symptoms of generalized anxiety disorder include being easily startled, inability to relax, headaches, and fatigue.[9]

83.     Kush Wilkerson's reaction to seeing his former cellmate was influenced by his disabilities: Mr. Wilkerson was triggered by seeing someone who previously sexually harassed him and responded impulsively.

84.     Defendant Sarver's interaction with Mr. Wilkerson occurred at least several minutes after Mr. Wilkerson's interaction with his former cellmate, and therefore after any threat of violence between the two had subsided.

85.     Defendant Sarver's use of force against Mr. Wilkerson was the direct result of his not being trained in de-escalation tactics that are necessary reasonable accommodations to ensure the safety and security of individuals with psychiatric disabilities such as Mr. Wilkerson.

86.     The initial tasing of Mr. Wilkerson by Defendant Sarver that begin the assault was done as Mr. Wilkerson partially turned towards Defendant Sarver to explain the basis for his actions.

87.     Plaintiff was instructed to put his hands up, but he was not given an opportunity to comply. He was tased almost immediately.

88.     There was no reason for Defendant Sarver to believe that when Mr. Wilkerson tried to explain his actions that he did not intend to comply with orders.

89.     There was no reason for Defendant Sarver to believe that when Mr. Wilkerson tried to explain his actions that using force was necessary.

---

[9] *Generalized Anxiety Disorder*, JOHN HOPKINS MED., https://www.hopkinsmedicine.org/health/conditions-and-diseases/generalized-anxiety-disorder (last accessed 5/21/2025).

90.     If Defendant Sarver had been properly educated about these common psychiatric disabilities and trained in how to interact with individuals who have those disabilities, he would have known the following:

- Brief delays in compliance are common with individuals with paranoid schizophrenia or other psychiatric disabilities, as disorganized thoughts are a classic symptom.

- Mr. Wilkerson deciding to explain himself right in that moment – rather than later or at a disciplinary hearing – can also be explained by disorganized thoughts and impulsive behavior.

- Taking the time to listen and communicate is an essential part of de-escalation, especially as it relates to individuals with psychiatric disabilities.

- Individuals with paranoid schizophrenia and PTSD are easily startled and often on edge, so communicating the reason for handcuffing and transporting someone is important, especially if they are expressing confusion.

- Calmly listening and responding are among the most basic methods of de-escalation and one of the most effective methods to communicate with individuals with psychiatric disabilities.

91.     Defendant Sarver failed to engage in the most fundamental and well-known de-escalation tactics, demonstrating a lack of understanding of how psychiatric disabilities can manifest and how to respond appropriately.

92.     Instead, Defendant Sarver immediately resorted to extreme violence, tasing Mr. Wilkerson.

93.     This resulted from a failure by Allegheny County in training ACJ staff on the fundamentals of psychiatric disabilities and de-escalation.

**Lack of Training by Supervisory Defendants**

94.     Supervisory Defendants Harper and Beasom have failed to provide necessary training to officers on a myriad of issues relating to use of force and individuals with psychiatric disabilities.

95.     This training is essential as ACJ officers are frequently required to respond to mental health crises and have near-total discretion over the types of force they are permitted to use.

96.     Supervisory Defendants have failed to train and implement policies and practices to ensure Defendants know how to interact with and respond to individuals with serious mental health concerns.

97.     Supervisory Defendants have failed to train and implement policies and practices to ensure Defendants know how and when it is appropriate to use force against an individual with a psychiatric disability.

98.     Supervisory Defendants have failed to train and implement policies and practices to ensure Defendants know how to properly adhere to a use-of-force spectrum that seeks to resolve conflict without force in the first instance, and with the least amount of force necessary whenever force is used.

99.     Supervisory Defendants have failed to adequately supervise and discipline Defendants when they use excessive force, including when they use excessive force against individuals with disabilities.

100.    As a consequence of Supervisory Defendants' lack of supervision, discipline, policies and training regarding use of force, officers routinely and wantonly seek to enforce compliance through brutal assaults without penological justification.

**Supervisory Defendants' Involvement in Use of Force Policies and Practices**

101.    As Warden, Defendant Harper was at all relevant times responsible for the oversight of ACJ, which included promulgating and enforcing policies, practices, and procedures concerning mental health, discipline, use of force, and officer training, and ensuring accommodations for incarcerated people with physical or psychiatric disabilities. Defendant Harper also had the authority to discipline officers.

102.    As Chief Deputy Warden, Defendant Beasom was at all relevant times responsible for promulgating and enforcing policies, practices, and procedures concerning use-of- force. He also oversees the investigation and discipline of corrections officers for use of force on incarcerated people confined at ACJ.

103.    Due to Supervisory Defendants' policies and practices, Mr. Wilkerson was subjected to unconstitutional excessive force by correctional officers.

104.    Defendants were aware of, and failed to prevent, ACJ officers' routine use of force, such as deployment of tasers and blunt physical force when not necessary to prevent injury or harm and against individuals with psychiatric disabilities.

105.    When ACJ correctional officers used force on incarcerated persons, including those with psychiatric disabilities, Supervisory Defendants learned of those incidents in detail in various ways, including through use-of-force reports and videos recording the incident, written and oral complaints by the incarcerated person against whom force was used, ACJ's internal affairs investigations, and by state mandated reporting requirements on ACJ's use-of-force data.

106.    For every incident where an officer uses force, including physical assaults and use of tasers, ACJ policy requires the officer who applied the force and every officer who witnessed or was involved in the use of force to submit a written report of the incident by the end of their shift.

107.    ACJ policy requires officers to include in their written report pertinent information about the incident necessary to allow the reviewer to assess the appropriateness of the force used, including the date, time, and location of the incident, an account of the events leading to the use of force, a complete description of the incident and reasons for employing force, a description of the method by which force was applied, including security equipment and weapons used, a description of the incarcerated person's resulting injuries, and other relevant information.

108.    The ACJ shift commander and/or immediate supervisor assembles all reports into a packet and forwards them, along with a video of the incident and other materials, to the ACJ majors, internal affairs, and to Defendant Harper.

109.    Upon information and belief, Defendants Harper and Beasom reviewed all reports regarding the July 12, 2023 assault and participated in determining whether to take corrective action for subordinate officers' conduct.

110.    Upon information and belief, Supervisory Defendants reviewed ACJ's use of force statistics, which included figures that showed ACJ had the highest number of assaults, physical uses of force, and stun device use in the state.

111.    Upon information and belief, Defendant Harper reviewed these statistics when preparing his mandatory Warden's Report to the Allegheny County Jail Oversight Board, which convenes monthly. These statistics demonstrate that ACJ's use of force rate was far in excess of

other jails in Pennsylvania, which should have been a clear cause for concern requiring scrutiny and remedial measures by Supervisory Defendants.

112.    ACJ's grievance process also provided notice to Supervisory Defendants of officers' use of excessive force.

113.    Upon information and belief, ACJ's Internal Affairs investigations also informed Supervisory Defendants of officers using excessive force.

114.    Upon information and belief, ACJ's Internal Affairs program was required to investigate allegations where a correctional officer used force against incarcerated individuals.

115.    Upon information and belief, when Mr. Wilkerson reported the use of force used against him on July 12, 2023, the Internal Affairs program did not investigate these allegations or conducted superficial investigations that were meaningless.

116.    Despite ample evidence of a culture and policy of deploying excessive force, defendants refused to change ACJ's policies and practices in a way that prevented or punished the use of brutal, excessive force prior to the July 12, 2023 assault.

117.    Defendants failed to provide training to officers as to how to interact with individuals with psychiatric disabilities prior to the July 12, 2023 assault.

118.    Defendants refused to change ACJ's policies and practices in a way that prevented or ameliorated the unnecessary and inappropriate use of force against those with psychiatric disabilities prior to the July 12, 2023 assault.

### COUNT I:  Fourteenth Amendment – Excessive Use of Force
### Against Defendants Sarver, Sundy, Holt, Covine, Kemp, and John Does 1-5

119.    All paragraphs herein are incorporated by reference.

120.    Defendant Sarver's decision to tase Mr. Wilkerson four times – including once in the scrotum and once in the anus – while he did not present any threat of harm, including at least

once when he was fully handcuffed, rather than attempt an alternative lesser means of force or de-escalation technique or seek mental health intervention, constituted force that was objectively unreasonable in violation of the Fourteenth Amendment.

121.    The decisions of Defendants' Sarver, Sundy, Holt, Covine, Kemp, and John Does 1-5 to repeatedly punch, kick, and otherwise brutalize Mr. Wilkerson when he did not present any threat of harm, including periods of time when he was fully handcuffed, rather than attempt an alternative lesser means of force or de-escalation technique or seek mental health intervention, constituted force that was objectively unreasonable in violation of the Fourteenth Amendment.

### COUNT II: Fourteenth Amendment – Excessive Force
### Against Defendants Harper and Beasom

122.     All paragraphs herein are incorporated by reference.

123.    Supervisory Defendants Harper and Beasom are liable for their personal involvement in failing to train, supervise, and discipline Defendants Sarver, Sundy, Holt, Covine, Kemp, and John Does 1-5, whose assault of Mr. Wilkerson resulted in the deprivation of his right to be free from excessive force under the Fourteenth Amendment to the Constitution.

124.    Supervisory Defendants were aware that a high proportion of the jail's population are individuals with psychiatric disabilities, and that unreasonable uses of force were often deployed on this population by jail staff.

125.    Supervisory Defendants condoned virtually all uses of force by officers, rarely if ever disciplined officers for their use of force, and failed to properly investigate allegations of physical abuse.

### COUNT III: Fourteenth Amendment – Excessive Force
### Against Defendant Allegheny County

126.    All paragraphs herein are incorporated by reference.

127.    Defendant Allegheny County was aware of the disproportionately high number of uses of force at Allegheny County Jail.

128.    Defendant Allegheny County was aware that unreasonable and excessive force was routinely used at the Allegheny County Jail against incarcerated individuals.

129.    Defendant Allegheny County was aware that unreasonable and excessive force was routinely used at the Allegheny County Jail against people with psychiatric disabilities.

130.    Prior lawsuits were filed against Allegheny County before the July 12, 2023 assault alleging excessive uses of force, including lawsuits alleging supervisory liability and class action claims regarding widespread patterns of excessive force.

131.    Defendant Allegheny County was deliberately indifferent to the highly predictable fact that unreasonable and excessive force would continue to be used at the Allegheny County Jail, including against individuals with psychiatric disabilities.

132.    Defendant Allegheny County failed to adopt needed policy changes to prevent unreasonable and excessive use of force at the jail and failed to adequately supervise and train jail staff on preventing unreasonable and excessive use of force.

133.    Defendant Allegheny County failed to adopt needed policy changes to prevent excessive use of force against individuals with psychiatric disabilities at the jail and failed to adequately supervise and train jail staff on how to interact with individuals with psychiatric disabilities.

### COUNT IV: Americans with Disabilities Act, 42 U.S.C. §12132
### Against Defendant Allegheny County

134.     All paragraphs herein are incorporated by reference.

135.    Mr. Wilkerson is a qualified individual with disabilities within the meaning of Title II of the Americans with Disabilities Act ("ADA").

136.    Mr. Wilkerson is diagnosed with paranoid schizophrenia, bipolar disorder, PTSD, major depressive disorder, and general anxiety disorder.

137.    These psychiatric diagnoses limit major life activities including but not limited to sleeping, working, communicating, and concentrating.

138.    Defendant Allegheny County is a public entity within the meaning of 42 U.S.C. § 12132.

139.    Defendant Allegheny County, and its employees, knew that Mr. Wilkerson was a qualified individual with disabilities covered by the protections of the ADA.

140.    Despite this knowledge, Allegheny County and its employees failed to provide Mr. Wilkerson with any reasonable accommodation for his disabilities.

141.    Such reasonable accommodations for Mr. Wilkerson include but are not limited to: basic education about common psychiatric disabilities; the provision of training to ACJ staff on recognizing when a person's behavior is a manifestation of their psychiatric disability; training staff on how to interact with people who have psychiatric disabilities so as to de-escalate situations; training staff on the contraindications of using force on individuals with psychiatric disabilities; and enacting policies mandating the intervention of mental health staff before the use of any force or discipline on individuals with psychiatric disabilities.

142.    This failure to provide reasonable accommodations deprived Mr. Wilkerson equal access to safe security practices and fair disciplinary procedures by failing to properly assess and de-escalate the situation and failing to take his psychiatric disability into account when communicating with and using force against him.

143.    Allegheny County acted with deliberate indifference to the risk of violating Mr. Wilkerson's federally protected rights under the Americans with Disabilities Act by permitting,

authorizing, acquiescing in, and otherwise enabling staff to use unreasonable force rather than attempting de-escalation in response to behaviors that were manifestations of mental health conditions and when such force was not necessary.

### COUNT V: Rehabilitation Act, 29 U.S.C. §794
### Against Defendant Allegheny County

144.    All paragraphs herein are incorporated by reference.

145.    At all relevant times, Defendant Allegheny County received federal funding for the Allegheny County Jail.

146.    Mr. Wilkerson is a qualified individual with a disability within the meaning of the Rehabilitation Act.

147.    Defendant Allegheny County, and its employees, knew that Mr. Wilkerson was an individual with disabilities covered by the protections of the Rehabilitation Act.

148.    Despite this knowledge, Allegheny County and its employees failed to provide Mr. Wilkerson with any reasonable accommodation for his disabilities.

149.    Such reasonable accommodations for Mr. Wilkerson include but are not limited to: basic education about common psychiatric disabilities; the provision of training to ACJ staff on recognizing when a person's behavior is a manifestation of their psychiatric disability; training staff on how to interact with people who have psychiatric disabilities so as to de-escalate situations; training staff on the contraindications of using force on individuals with psychiatric disabilities; and enacting policies mandating the intervention of mental health staff before the use of any force or discipline on individuals with psychiatric disabilities.

150.    This failure to provide reasonable accommodations deprived Mr. Wilkerson equal access to safe security practices and fair disciplinary procedures by failing to properly assess and

de-escalate the situation and failing to take his psychiatric disability into account when communicating with and using force against him.

151.    Allegheny County acted with deliberate indifference to the risk of violating Mr. Wilkerson's federally protected rights under the Rehabilitation Act by permitting, authorizing, acquiescing in, and otherwise enabling staff to use unreasonable force rather than attempting de-escalation in response to behaviors that were manifestations of mental health conditions and when such force was not necessary.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court grant the following relief:

A.    Award Plaintiff compensatory and punitive damages on all claims;

B.    Grant attorneys' fees and costs;

C.    Such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff requests a trial by jury with respect to all matters and issues properly triable by a jury.

Respectfully submitted,

*/s/ Dolly Prabhu*
PA I.D. No 328999
dprabhu@alcenter.org
*/s/ Jaclyn Kurin\**
D.C. I.D. No. 1600719
jkurin@alcenter.org
*/s/ Bret Grote*
PA I.D. No. 317273
bretgrote@alcenter.org
**Abolitionist Law Center**
PO Box 23032
Pittsburgh, PA 15222
412-654-9070
*\*pro hac vice pending*

24